Filed 6/26/23  P. v. Martin CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL DANIEL MARTIN,<br><br>        Defendant and Appellant. | A163959<br><br>(Napa County<br>Super. Ct. No. 19CR003514) |

A jury convicted defendant Michael Daniel Martin of attempted murder and four other crimes, and found true various enhancements.  The trial court sentenced him to an indeterminate term of 14 years to life in prison, plus a determinate term of 13 years and 4 months in prison.  On appeal, defendant raises a number of evidentiary and instructional challenges.  He also argues, and the People agree, his sentence must be vacated in light of ameliorative changes on two different sentencing schemes applicable to his case.  We affirm defendant's convictions, but vacate his sentence and remand the matter to allow the trial court to resentence him under current sentencing laws.

**BACKGROUND**

The charges against defendant arose from allegations that on the evening of December 11, 2019, he drove his then wife, Heather Robinson, to a

1

remote location up in the hills in the City of Napa, punched and strangled her while inside the vehicle, and then struck her with the vehicle as she tried to escape, causing her to fall down a ravine and sustain serious injuries. Defendant's defense at trial was that Robinson drove herself over the ravine, and that he was not near the accident site at the time.

**The Evidence**

*The Prosecution Case*

**Heather Robinson**

In early 2015, Robinson began a relationship with defendant, then a patient at a drug and alcohol treatment facility where Robinson was working. Some time that year, defendant moved in with Robinson in her apartment in Napa.

On October 4, 2015, Robinson, a former addict who had been sober for about two decades, relapsed with alcohol. Realizing she was drunk, Robinson went into her bathroom. Defendant came in and "lined up some meth." Upset by this, Robinson hit the mirror and knocked the methamphetamine away. Defendant then hit Robinson and put his hand over her throat so that she could not breathe. Robinson repeated to defendant, "[Y]ou're killing me." She then passed out. When Robinson woke up, she looked in the mirror and saw she had bruises all over her face and a black eye, and one of her eyes was shut closed.

Robinson told her boss she had relapsed and quit her job. She did not report the incident to the police.

After a few weeks had passed, Robinson stayed at her sister's house for a couple of days. After that she stayed at a homeless shelter for victims of domestic violence for another several days. Robinson did not leave the relationship with defendant, despite being told by others to do so, because she

2

"loved him so much."

At some point in 2015, defendant was convicted of robbery, and between 2015 and 2019, he was imprisoned. Robinson visited defendant while he was in custody, and the two got married in 2015. Robinson found a job working for an agency that helped find housing for homeless people.

In late October 2019, defendant was released from prison. On October 31, Robinson learned from defendant's sister that defendant had relapsed. At 2:30 a.m. on November 1, defendant showed up drunk at Robinson's apartment. Terrified that he would get violent, Robinson asked defendant to leave but he refused. Defendant also did not allow Robinson to leave. Robinson then called defendant's parole officer and told him that defendant had been drinking and that she was scared. Upset that Robinson had called his parole officer, defendant told Robinson that "people end up in ditches," "he was not going back to prison," and "he knew how to get rid of people."

When defendant's parole officer showed up at Robinson's apartment, she told him that she wanted defendant to stay because he had told her he would stop drinking. The parole officer left.

On another occasion in November, Robinson overheard defendant talking to "some other girl on the phone." Robinson got upset, started cursing and yelling at defendant, and took the phone from defendant's hand and yelled, "I'm his fucking wife." Robinson then picked up her phone and said, "[F]uck you. I'm calling your PO."

Defendant then followed Robinson outside, grabbed her phone, threw it on the ground, and stomped on it. He told Robinson to "get in the fucking house." When Robinson had her hand on a gate to open it, defendant grabbed her arm and tried pulling her back into the apartment. Robinson broke free and ran down the street shouting for help. Some people nearby walked her

3

back to the apartment.  Robinson drove away in her car and called the police on her work phone.

When a police officer arrived at Robinson's apartment, she told him defendant was drunk, he had stomped on her phone, and she wanted him out of her home.  The officer asked her if defendant had harmed her, but she replied that he had not.  Robinson's arm hurt, and she was unable to move it.

When she went to work the next day, she told her coworkers what happened and that she was afraid of defendant.  She also said to them, "[I]f I ever came up missing that they needed to find me because he had killed me."

Following these incidents, defendant repeatedly told Robinson, "[Y]ou're done.  You're done.  People that snitch you're done.  I know how to get rid of bodies.  You know I'm not going back to prison."  Robinson packed her car and stayed with her friend Heidi for four days.

When Robinson returned home from her friend's home, she learned from defendant's mother and parole officer that defendant was staying at his mother's house.  Defendant's mother showed up with defendant at Robinson's apartment upset, and eventually Robinson allowed him to stay at her apartment with the understanding that he would leave in a couple of days.  As of November 28, defendant and Robinson had made up and were living together again.

In the weeks that followed, defendant continued to drink alcohol and yell threats at Robinson.  He also would not let Robinson go inside her room and shut her door; he would open the door and asked her who she was talking to and wanted to look at her phone.  Defendant told Robinson, "I'm not gonna let you lay in here and call the cops."  Defendant "was just constantly coming in the room and standing over [her]."

Their neighbors often heard the two of them fighting, shouted at them

4

to be quiet, and called the police several times. Robinson did not report to police that defendant was threatening her because she believed he would change.

On December 10, defendant and Robinson got into an argument while they were looking up their credit reports. Defendant accused Robinson of buying a house with someone else. He also said that he had heard from others that Robinson was having an affair with one of her clients at the agency she worked at. Eventually, they stopped arguing, and defendant let Robinson go to bed.

On December 11, Robinson went to work and when she arrived home that afternoon, all of the blackout curtains in the living room were closed. Defendant came from behind the door and told her he wanted all her phones, credit cards, computers, passwords, and "access to everything." Afraid, Robinson complied.

That evening, defendant asked Robinson for money to buy cigarettes and for her car to go to the store. They started arguing. Robinson then said he could take the car, but she would come with him. They got into Robinson's car. Defendant pushed the seat all the way back to accommodate his 6'3" height. When defendant did not make the turn to go to the corner store, Robinson became terrified.

Defendant drove them through Downtown Napa until he reached a dead end near a church. He flipped the car around and shut it off. He asked Robinson how to turn off the car lights, which turned on when he shut the car off. Robinson took the key fob from him to turn off the lights and put it in her pocket. He then asked for the key fob back, but Robinson refused to hand it over. Defendant started smoking marijuana and once he finished, he asked Robinson for cigarettes. Robinson refused.

Defendant started driving again, telling Robinson, "I know the truth. You need to get honest with me. You need to tell me the truth. You don't have to lie to me." If she did not tell him the truth, defendant said, "[you're] done. . . . [T]hat's it. I've given you enough chances . . . . You're done. You're done." Robinson understood this to mean she was going to die. It was raining, and defendant was driving erratically. Robinson closed her eyes and prayed.

At some point later, defendant started driving uphill on a road. Eventually he stopped the car and repeated to Robinson, "Tell me the truth. This is your last chance." Robinson started smiling, thinking to herself, "how insane . . . that this is happening." Defendant responded, "[A]re you laughing at me?" before grabbing Robinson by the hair, punching her twice in the face, and choking her. Robinson told him, "Michael, you're killing me."

Robinson managed to unbuckle her seatbelt, open the car door, and walk outside toward the back of the car. Defendant got out of the car and followed her. Robinson walked towards the front of the car. Just then, she heard the car door shut and the car accelerate. Robinson felt the car strike her right leg, and she fell down a hill. When Robinson looked up from where she lay on the dirt, she saw defendant standing at the top of the hill, calling her name. Robinson hid so defendant could not find her.

Robinson, lying in a bush and in pain, heard cars occasionally driving by. At some point, she decided to go towards the cars. She used her one good leg to push herself uphill through the mud and came upon her car stuck in the hillside. Robinson crawled into the driver's seat and tried to honk the horn to sound, but could not because the air bag had deployed. She then changed the car's gear from neutral to park, put the passenger's side seat into a reclining position, crawled over it into the back seat, and put the seat back

up.  Robinson wrapped herself in a blanket and robe that were in the car and rested for the evening.

The next morning, Robinson heard someone up from the hill yelling. Robinson screamed, "Help me," and a man approached her and tried to call for help on his phone.  He eventually handed her the phone, and Robinson explained that she was in a ditch.  A woman then approached Robinson with a blanket and water.  Soon after, she heard medical personnel arrive and was transported to a hospital.  At the hospital, Robinson spoke to a detective and told him that her husband was responsible for what had happened to her.

Robinson had to undergo surgery on her leg and arm, and was bedridden for about a week.  She was released in a wheelchair.

In February 2020, Robinson filed for divorce.

### Other Percipient Witnesses

Robinson's next-door neighbor, Jyl Glover, testified that Robinson was a positive and upbeat person until a man had moved in with her.  Glover heard daily arguing "over and over . . . ."  She specifically heard the man swearing and yelling derogatory statements.  Glover complained to the landlord and the police about the noise.

Robinson's coworker, Maricela Pelayo, testified that before November of 2019, Robinson was always happy and joking.  Pelayo noticed an immediate change in Robinson's behavior when defendant was released from prison. She started showing up late to work or leaving early, and her attitude was more serious and less happy.  Pelayo testified that sometime before Thanksgiving of 2019, Robinson arrived to work with an arm sling.  Pelayo referred her to a domestic violence agency.  Robinson told Pelayo that if she did not show up to work one day, to look for her, because that would mean something had happened or gone wrong.  When Robinson did not show up to

work on the morning of December 12, 2019, Pelayo and other coworkers tried to locate Robinson by calling a number of people, including defendant's mother and Robinson's sister, and driving over to Robinson's apartment.

Melissa Blonigen, another coworker of Robinson's, also noticed a change in Robinson's mood and behavior after defendant returned home from prison. Robinson became more introverted and would sometimes have quiet conversations over the phone, after which she would be upset and leave. Blonigen also testified that Robinson showed up to work in an arm sling one day. And she recounted the day when Robinson did not arrive to work on December 12, 2019, testifying that she and other coworkers tried to call Robinson and other people to get information on her location.

Robinson's friend Heidi Gigandet testified that in either fall or winter of 2015, she saw Robinson had bruises all over her face and a black eye as if she had been severely beaten. In November of 2019, Robinson stayed at Gigandet's house for several days. Robinson was emotionally distraught, and she had complained about pain in her right arm. Robinson told Gigandet that she had an argument with defendant, tried to leave her home, and defendant physically stopped her by putting his hands on her and grabbing her arm.

Defendant's father, Dan Lilly, testified that defendant called him once at around 10:10 p.m. on December 11, 2019, but the connection was bad and the call was dropped. Immediately afterwards Lilly called defendant's mother, Deborah Martin, and told her he had just received a dropped phone call from defendant. At approximately 10:35 p.m., while Lilly was on the phone with Deborah[1], he heard a loud knock on her door, followed by

---

[1] To avoid confusion with defendant, we refer to Deborah Martin by her first name.

8

defendant's voice.

Deborah testified that defendant had called her around 10:05 p.m. or 10:10 p.m. on December 11, 2019. The connection also was poor and the call dropped, so defendant called again on Deborah's other phone. That call also dropped, after which Deborah tried calling defendant but could not get through. Deborah then spoke to Lilly over the phone. Approximately 35 to 40 minutes later, defendant showed up at Deborah's house in wet clothes. Defendant stayed overnight at Deborah's house.

On December 12, 2019, defendant was arrested outside of Deborah's house.

### Medical Personnel

On December 12, 2019, paramedic Daniel Gernetzke responded to the scene and found Robinson in the back seat of her vehicle, which was down a 50- to 70-foot embankment. The large indentation in the earth that was a significant distance away from the roadway, as well as the front end damage to Robinson's car, indicated that the car had accumulated enough speed to fly off the roadway and launch "nose first into the earth." Robinson told Gernetzke that she had gotten into a fight with a man, who had strangled her and pulled her hair out. Robinson said she was able to escape and jump out of the vehicle, but was struck by her car, and then launched over the hillside and into the bushes. Robinson appeared anxious, dirty, muddy, and frightened. She had visible abrasions on her body, redness around her neck, and limited mobility in her upper and lower extremities. She also complained of pain to her throat. Due to the severity of her pain, Robinson had to be lifted by the fire department in a roped rescue basket.

Dr. Michael Shifflett examined Robinson at the hospital on December 12, 2019, and found that Robinson suffered fractures to the bones in her

9

upper left arm and right lower leg, injuries that required surgery. Such injuries were caused by "high energy trauma," which may include, for example, being involved in car accident. Robinson told Dr. Shifflett that she had been assaulted by her husband, who then hit her with a car, causing her to roll down an embankment. Dr. Shifflett testified that Robinson's injuries were consistent with her account of events. There was a low likelihood, Dr. Shiflett explained, that Robinson's injuries were caused due to her being in the driver's seat and getting into a collision, during which the airbags deployed and the cabin of the vehicle remained intact.

### Law Enforcement

On December 12, 2019, Sergeant David Quigley from the Napa County Sheriff's Department responded to the scene. He saw Robinson's car facing downhill 20 feet off the side of the road and 30 feet down the embankment. Quigley saw "a lot of damage" on the driver's side of the vehicle: the windows and windshield were broken, and the airbag had been deployed. There also were dents on top of the hood.

Also on December 12, 2019, Detective Joseph Perry responded to the hospital where Robinson was admitted. Robinson, lying on the hospital bed, had injuries to her face and body, including a black eye to her right eye. She appeared to be in pain and looked "very disheveled." Perry asked her what happened. Robinson stated defendant had punched and strangled her inside the vehicle, she got out of the car and ran, she was hit by the car, and she fell down the ravine. Robinson also stated that defendant looked down at her afterwards from the roadway. Robinson's interview, which was recorded on Perry's body camera, was played for the jury.

Robinson also told Detective Perry that approximately two weeks earlier, defendant had grabbed her arm and injured her. Perry observed red

10

markings on her neck and bruising around her right eye.

Jacqueline Shikowitz, an evidence technician for the Napa County Sheriff's Department, inspected and took photographs of Robinson's damaged car. Shikowitz testified that the driver's "seat was pushed all the way back away as far as it could be from the steering wheel," consistent with the height of a taller person.

Defendant's former parole officer, Kamal Singh, testified about the events in early November 2019. On November 1, 2019, Robinson contacted Singh to report that defendant was under the influence of alcohol and drugs. On November 4, Singh contacted defendant, and he admitted using alcohol. When Singh visited Robinson's home, she stated she wanted defendant placed in an outpatient treatment program. Robinson called Singh on about five other occasions, expressing her concerns about defendant's treatment. She never reported domestic violence.

On November 20, 2019, Officer Adam Barrera responded to Robinson's home when she called the police. Robinson stated that defendant had broken her phone, but she did not report any violence.

**Vehicle Evidence**

Detective Alfred Speake, the People's computer forensic expert, testified that Robinson's car was equipped with an infotainment system that collected GPS data of the vehicle, as well as diagnostic trouble code (DTC) logs, which identifies when a problem with the car arises. Speake downloaded the data from Robinson's car and gave it to Detective Perry.

The GPS data showed that at 9:06 p.m., Robinson's car was located near a highway and church on the valley floor in the City of Napa. At 9:22 p.m., the car traveled on Mount Veeder Road, a road that runs from the valley floor and up the hills in Napa. At 9:56 p.m., the car was located near a

11

turnout area on Mount Veeder Road. And at 10:01 p.m., Robinson's car registered a catastrophic event.

Aaron Medina, a police sergeant and the People's accident reconstruction expert, examined Robinson's vehicle and data from the airbag control module of the vehicle. An airbag control module collects data from numerous sensors in the vehicle for the purpose of determining whether or not to deploy the airbags. Some of the data that the module collects includes when there is a change in velocity in a rapid period of time. In this case, the vehicle registered two events, each taking place within seconds of one another. The airbags deployed during the first event. They did not deploy during the second event because they had already deployed, but the change of velocity was enough for the airbag control module to record an event.

The data indicated that leading to the first event, the throttle was at 100 percent, meaning the gas pedal was pushed down all the way. Other data showed that there was a jump in wheel speed, suggesting that the vehicle lost traction, which, in turn, was consistent with the vehicle going off the roadway and catching air before hitting the ground. Additionally, during that period, the steering wheel data showed a hard turn to the left, followed by a hard turn to the right, and application of the brakes, consistent with the vehicle losing control. During the second event, there was an even greater velocity change, consistent with the vehicle being stopped or its wheels locking up or sliding. Overall, the two events recorded were consistent with a vehicle driving off a roadway, catching air, hitting the ground, and then hitting something that made it come to a complete stop. Based on photographs of the scene, Medina testified that a boulder in the immediate area may have caused the second event.

Medina testified that hitting a person generally would not cause

12

airbags to deploy because a car weighs much more than a person. If a car is moving fast, Medina explained, a person would be a "very low amount of force applied to that vehicle compared to the weight and the volume—and the energy moving down the road," such that it would not trigger the airbag deployment.

Medina also examined the vehicle itself and found that the damage to front of the hood and windshield was consistent with a person having been hit by the car.

### Cell Phone Evidence

Detective Perry retrieved defendant's cell phone and obtained his phone records from his carrier, Verizon Wireless (Verizon). In addition to call and text records, Verizon provided two types of cell phone location data for defendant's phone, as testified to by Jim Cook, the prosecution's expert in interpreting and mapping cell phone location data.

One type of cell phone location data was cell tower or cell site data. A cell tower or site "is an antenna used by a carrier to facilitate the connection between the cellular phone and the wireless network." When a call or text is placed or received, or a "data event" occurs, a record is created in the network of the carrier—here Verizon. A data event is an activity by a phone, other than a call or a text, that connects to the network; it can be passive, such as when an application on a device decides to complete an update, or user-initiated, such as when the user actively engages an application. Cell phones connect to the tower with the strongest signal, which, depending on factors including elevation and physical impediments, may not be the tower geographically closest to the phone. For example, because of Napa's hilly topography, cell phone users may not always connect to the closest tower; a different tower might provide a better line of sight to the phone. Cell tower

13

data can "show a general vicinity of coverage related to a particular call, text or data event."

The second type of location data was obtained from Verizon's proprietary software called Real Time Tool, or RTT.  RTT uses an algorithm to identify the approximate longitude and latitude of the phone.  Cook explained that the distance was calculated by Verizon based on "how long a signal takes to get to the antenna and then back to the device."  He added that RTT data "provides a location with a degree of accuracy . . . for calls, texts, and data" made or received by a cell phone.  Cook also confirmed that Verizon gives this disclaimer on RTT data:  "Measurements with a high confidence factor may be more accurate than with a low confidence factor," meaning that their RTT data measurements are the best estimates available, rather than precise locations.

Cook analyzed and compared location data for defendant's phone using cell towers and, when applicable, RTT data.  With respect to the cell tower data, Cook imported that data into a computer program that he used to map out which cell towers defendant's phone connected to on December 11 and 12, 2019.  Cook also visited the crime scene, as well as the various cell towers that defendant's phone had connected to, in order to authenticate that those towers were in place, and to determine if there were any potential obstructions that could impact connectivity.

Cell tower data between December 11 and 12, 2019 showed defendant's phone connected to five towers—two on the valley floor near defendant's mother's residence and Robinson's residence in Napa, one just outside of town on a ridge, one adjacent to a vineyard outside town (cell tower 718), and one on top of a mountain facing the direction of the crime scene (cell tower 802).  As pertinent here, on December 11, data events on defendant's phone

14

occurred at 10:05 p.m.  These events were followed by an outbound call at 10:07 p.m. to the landline of his grandmother, with whom his mother Deborah lived.  The data events and outbound call connected to cell towers 718 and 802, respectively.  According to Cook, this was consistent with the phone being in the vicinity of where Robinson's car went off the roadway on Mount Veeder Road; it was not consistent with being down on the valley floor in Napa.

Defendant's phone also made outbound calls to his father Dan Lilly at 10:11 p.m. and 10:13 p.m.  Those calls connected to cell tower 802, which activity was also consistent with the phone being in the vicinity of the crime scene.

At 10:25 p.m. and 10:26 p.m., defendant's phone made outbound calls to Robinson's work phone.  Those calls were consistent with the phone being down on the valley floor, not in the vicinity of the crime scene.

Cook also interpreted defendant's RTT data, which indicated that a data event at 10:06 p.m. took place within a radius of about 17.7 miles from cell tower 802.  This was consistent with the phone being in the area of the crash site.  The call activity between 10:11 p.m. and 10:14 p.m. similarly indicated a radius of about 17.3 miles away from cell tower 802, again consistent with being in the crime scene area.

Cook also recounted defendant's text records.  Defendant's phone sent a text to Robinson's work phone at 10:28 p.m. on December 11, stating, "Honey, really?  You're going to leave me hanging this long.  Are you serious?  Where did you go, to Santa Rosa?  Please don't leave me hanging like this."  At 11:35 a.m. the next morning, defendant's phone sent a text to Robinson's work phone saying, "Heather, what is going on?  You need to call somebody.  People are worried."

15

Cook testified that defendant's phone was either powered off or unable to make connection during the 13-hour period between the last call or text on December 11 and the first call or text on December 12.

Cook further compared the GPS data from Robinson's car with defendant's cell phone records and found the car's recorded path of travel matched with defendant's cell phone activity. Defendant's phone activity between 10:05 p.m. and 10:14 p.m. was consistent with the phone having been in the vicinity where the car went off the roadway.

### Intimate Partner Battering Evidence

Melissa Kelly, an investigator with the Napa County District Attorney's Office, testified as an expert in the investigation of domestic violence cases. Kelly had spoken and met with Robinson, but had never met defendant.

Kelly discussed the "the power and control wheel," a visual representation that depicts certain tactics commonly used by perpetrators of domestic violence to gain power and control over their partners. Each "spoke" or "wedge" of the wheel corresponds to one of the eight tactics of power and control. One of these is emotional abuse, which can take the form of name calling, accusing the partner of cheating or other things the perpetrator knows to be false, making the partner feel not good enough, and "trying to make somebody feel crazy or second guess what they know to be true by repeating something over and over and over again." A second tactic is isolating the partner from his or her support system, family, and friends.

A third power and control tactic is denying, minimizing, and blaming, a tactic that is used to make the partner believe that what had happened is not as bad as it really was. This in turn is used to keep the victim from realizing the extent of abuse in the relationship.

16

A fourth power and control tactic in domestic violence is using children, such as trying to convince a partner that he or she is a bad parent or that the children would be safer if they were not with the partner.

A fifth power and control tactic is using privilege, meaning when one person establishes that there are rules in the relationship and that the person who is the abuser has all the strength and decision-making powers in the relationship, while the other person is treated as a second-class citizen or servant.

A sixth tactic is economic abuse, which involves using money for the purpose of keeping a partner from leaving the relationship or doing things that the abuser doesn't want the partner to do.

A seventh tactic of power and control is using coercion and threats, which may or may not involve physical harm

An eighth power and control tactic is intimidation, which is similar to threats, but does not take only the form of words. It can be more physical, such as using a larger body size, blocking doorways to prevent access, displaying weapons, punching walls, or destroying property that belongs to the victim.

On this topic, the prosecutor, in the form of hypotheticals, asked Kelly if certain behaviors exemplified some of the tactics she described. For instance, the prosecution asked if examples of emotional abuse could include accusing the victim of cheating or of other things the abuser knows to be false, using the victim's addiction and relapse against him or her, or calling the victim derogatory names. Kelly answered such questions in the affirmative.

Kelly testified that not all of these tactics are used in every case of domestic violence because the dynamics of every relationship is different.

17

Some of these tactics may be used by some perpetrators, but not by others. Some of them may not apply at all. Understanding the power and control tactics, however, is a way for law enforcement and other professionals who work with people in domestic violence relationships to understand why someone is either staying in a relationship or denying there is violence in a relationship. Kelly explained that although these power and control tactics are often seen in domestic violence cases, "it's not a clear-cut science that we're going to see this every time."

Kelly then discussed the "cycle of violence" within a domestic violence relationship, which cycle is broken down into three phrases. The first is the "honeymoon" phase, during which both partners are on their best behavior and affectionate with each other. Then, as the tension sets in, the relationship enters the "tension-building" phase, in which you begin to see more yelling, arguing, name calling, or putting down the other partner. Finally, there is the "explosive" phase. In this phase, a partner may commit actual violence, physical or sexual, against another person, or may demonstrate a propensity for violence such as punching a wall. After the explosive phase, the relationship reverts back to the honeymoon phase, thus beginning the cycle of violence all over again.

Kelly explained that not every case of domestic violence ends up with physical injury; conversely, the absence of injury does not mean a person is not a victim of domestic violence. Kelly also testified that based on her experience, it is not very common for a victim to report an incident of abuse immediately after it happens. Sometimes victims delay reporting a domestic violence incident or fail to report altogether. Kelly testified there are a variety of reasons for the failure to report or delayed reporting. All of the dynamics of power and control, as well as the cycle of violence, are at play. A

18

victim may want to protect the abuser, may be in love with the abuser, or may not want the abuser to go to jail or lose his or her job. The failure to report or delayed reporting may be out of love, fear, embarrassment, or economic reasons. Similar reasons may also explain why victims sometimes report, but minimize, the severity of an incident of domestic violence.

According to Kelly, there is no particular profile of a domestic violence victim; even a strong, outspoken person could become a victim.

### *The Defense Case*

In opening statement, defendant's trial attorney argued there would be no evidence "that [defendant] was behind the wheel that night whatsoever driving the car." Rather than demonstrating that defendant hit Robinson with her car, counsel argued, "The evidence will show [defendant and Robinson] left approximately 9:00 o'clock [*sic*] p.m. from their home. And they go driving, and during that drive, they're talking, they're arguing over money again, and again, and again, to the point where the car pulls over and [defendant] gets out presumably to either go to the bathroom or just to get out. And then [he's] left at the side of the road. That's when [Robinson] keeps driving. Then she proceeds to drive all the way up to Mt. Veeder ultimately going over the ravine."

Shareen Cronin, the defense expert in blunt force trauma and strangulation, opined that Robinson's injuries were consistent with being hit by a car, but that there could be other explanations for the injuries, such as falling down from a location with height. Cronin also testified that if Robinson's injuries were caused by being hit by a car, one would expect to see rashes, cuts, abrasions, or head injury.

While Cronin opined that the markings on Robinson's lower extremities were not consistent with being hit by a car, she testified that it is possible to

19

break a bone after being hit by a car and not necessarily have a big odious injury. As for Robinson's arm fracture, Cronin said such injury could be consistent with being hit by a car and being thrown down a ravine, but that it was also possible that the injuries were consistent with being in a car accident.

Cronin also testified that the red markings on Robinson's neck did not "definitively" show she had been strangled. While the markings could indicate strangulation, they also could have been sustained during the event that caused her leg and arm injuries.

The defense also called Chris Kauderer, their accident reconstruction expert, to testify. Kauderer opined that there was no damage to the outside of Robinson's vehicle that proved the vehicle had struck a pedestrian. He pointed to the absence of any evidence of clothing or human biologicals, such as skin, blood, or hair, on Robinson's vehicle, evidence he would expect to normally see if a vehicle had contact with a pedestrian.

Instead, Kauderer opined that the damage to the left front corner was consistent with the vehicle striking a rock or tree while traveling down the hillside. Kauderer could not say exactly what caused the crack on the windshield. He believed the damage likely was also caused by the car striking a rock or tree on its way downhill, though he did not see any debris, mud, or tree bark on the windshield or hood.

Kauderer agreed with the prosecution's accident reconstruction expert that based on the airbag control module, there was an unbuckled driver in the driver's seat, and no one in the passenger's seat, at the time of the accident; the car was airborne for a period of time; and there was a second event in which the airbags did not deploy because they already had been deployed during the first event. Kauderer also agreed that it is not

uncommon for the module to register a pedestrian collision. Kauderer confirmed that there was nothing he had reviewed in the airbag module data that was inconsistent with the vehicle having hit a person prior to going over the embankment and hitting the ground and then the rocks.

**The Charges, the Verdict, and the Sentence**

By an information filed on January 6, 2020, and amended on October 4, 2021, defendant was charged with attempted willful, deliberate, and premeditated murder (Pen. Code, §§ 664, 187, subd. (a); count one); assault with a deadly weapon (*id.*, § 245, subd. (a)(1); count two); assault by means likely to produce great bodily injury (*id.*, § 245, subd. (a)(4); count three); corporal injury to a spouse (*id.*, § 273.5, subd. (a); count four); and criminal threats (*id.*, § 422; count five).

The information also alleged as enhancements that defendant personally used a deadly and dangerous weapon (Pen. Code, § 12022, subd. (b)(1)) as to count one, and personally inflicted great bodily injury in commission of counts one and two under circumstances involving domestic violence (*id.*, § 12022.7, subd. (e)). As to all counts, the information alleged appellant had suffered a prior strike conviction (*id.*, § 667, subds. (b)–(i)) and a prior serious felony conviction (*id.*, § 667, subd. (a)(1)), and had served a prior prison term (*id.*, § 667.5, subd. (a)).

On October 5, 2021, a jury found defendant guilty on all counts and found true all conduct enhancement allegations. The trial court found true the prior conviction and prison term allegations.

And on November 3, the court sentenced defendant to an indeterminate term of 14 years to life in prison, plus a determinate term of 13 years and 4 months to run consecutively to the indeterminate term.

The indeterminate term consisted of the middle term of seven years to

life on the count one attempted murder conviction, doubled to 14 years to life due to the prior strike conviction.

The determinate term was comprised of the following:  the middle term of three years on count four, doubled to six years due to the prior strike; eight months on count five (one-third of the middle term), doubled to 16 months; one year on the weapon enhancement with respect to count one; and the upper term of five years for the great bodily injury enhancement also with respect to count one.  The court selected the upper term for the great bodily injury enhancement "[b]ecause of the major injuries that Ms. Robinson suffered, the broken leg or knee, the shoulder, regarding [*sic*] several surgeries."

As to the remaining counts two and three, the court imposed their middle terms for an aggregate sentence of five years, four months, but stayed them pursuant to Penal Code section 654.

This timely appeal followed.

## DISCUSSION

### Admission of Expert Testimony on Cell Phone Location Data

Defendant first challenges the admission of testimony from the prosecution's wireless technology expert, Jim Cook.  He contends that Cook was not qualified to give an opinion on cell tower location data and that a portion of Cook's opinions was based on unreliable information.  We disagree with these contentions.

#### *Qualification of the People's Cell Phone Expert Witness*

"A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates."  (Evid. Code,

§ 720, subd. (a).)[2] "Against the objection of a party, such special knowledge . . . must be shown before the witness may testify as an expert." (*Ibid.*) The witness's expertise "may be shown by any otherwise admissible evidence, including his [or her] own testimony." (*Id.*, subd. (b).) Section 801 provides that "[i]f a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is: [¶] (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and [¶] (b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion."

"The trial court is given considerable latitude in determining the qualifications of an expert and its ruling will not be disturbed on appeal unless a manifest abuse of discretion is shown." (*People v. Kelly* (1976) 17 Cal.3d 24, 39 (*Kelly*); accord, *People v. Nelson* (2016) 1 Cal.5th 513, 536.) "Such an abuse of discretion will be found only where ' "the evidence shows that a witness *clearly lacks* qualification as an expert." ' [Citations.]" (*People v. Chavez* (1985) 39 Cal.3d 823, 828, citing *People v. Hogan* (1982) 31 Cal.3d 815, 852, disapproved of on other grounds in *People v. Cooper* (1991) 53 Cal.3d 771, 836.) " ' "Where a witness has disclosed sufficient knowledge of the subject to entitle his opinion to go to the jury, the question of the degree of his knowledge goes more to the weight of the evidence than its admissibility." ' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 322.)

---

[2] Further undesignated statutory references are to the Evidence Code.

In light of the "considerable latitude" afforded a trial court in determining the qualifications of an expert (*Kelly*, *supra*, 17 Cal.3d at p. 39), we cannot say the trial court abused its discretion in permitting Cook to testify as an expert in wireless technology in general and cell phone location data in particular.

Cook began working in the cell phone industry over 30 years ago, first as a sales representative for various cell phone companies for several years, then as an owner of ten retail locations, and after that, as a field representative for AT&T. While working in the cell phone industry, Cook interfaced with and assisted a number of engineers in both erecting and fine-tuning cell sites in order to maximize coverage. Eventually, Cook started his own business, Premier Cellular Mapping and Analytics. Additionally, since 2006 Cook has been serving as wireless expert in court proceedings. He has testified as an expert over 110 times on topics such as call detail records, device exams, cell phone technology, how cell sites work, and cell phone artifacts, such as Google search data and social media activity. Also, as a wireless expert, Cook interprets carrier call and text message records, text messages, and other data supplied by cell phone carriers, and based on that information, maps out where a cell phone might be located. Cook is also a certified instructor for the California Peace Officers Standards and Training One and the California District Attorney's Association, and has taught at various conferences nationwide. For nearly 25 years, he has been teaching the evidentiary value of a cell phone and digital evidence.

Although the defense during voir dire examination focused on Cook's lack of a college degree or the fact he was not an engineer, the above demonstrates that Cook had a considerable amount of on-the-job experience with cell phone technology, cell towers, and analyzing cell phone records,

which includes mapping the location of a cell phone in relation to various cell towers.

Defendant's counterarguments are unavailing. He claims that "Cook had no training on how cell sites work," and at most he only personally observed others "test and fine tune cell sites." These contentions are belied by Cook's testimony, discussed above. While working in the wireless field, Cook did not merely observe but rather assisted engineers in erecting and fine tuning cell sites at various locations. Further, defendant ignores that Cook, while not an engineer himself, has been working with cell phone technology in some capacity over the past 30 years, during which he gained extensive experience and training on a number of topics related to cell phone technology, including how cell towers work and how to interpret data related to cell towers. In short, defendant cannot show Cook " ' "clearly lack[ed] qualification as an expert" ' " in cell site location information. (*People v. Chavez, supra,* 39 Cal.3d at p. 828, italics omitted.)

Accordingly, the trial court properly allowed Cook to testify as an expert. Questions concerning the degree of Cook's knowledge and reliability of his testimony were explored at length before the jury, and went to the weight of the evidence rather than its admissibility. (*People v. Bolin*, *supra*, 18 Cal.4th at p. 322.)

### *Reliability of the Basis of the Expert Opinion*

Defendant next argues that the portion of Cook's testimony regarding Verizon's RTT data should have been excluded as unreliable under section 801. (§ 801, subd. (b) [expert testimony must be "[b]ased on matter . . . perceived by or personally known to the witness or made known to him at or before the hearing . . . that is a type that reasonably may be relied upon by an expert . . ."].) By way of recap, RTT data refers to a type of location data

25

obtained from Verizon's proprietary software that uses an algorithm to identify the approximate longitude and latitude of a phone. Defendant claims that because Cook did not personally verify the RTT data provided in the cell phone records, his opinions pertaining to that data were based on unreliable information. Defendant acknowledges he did not object to the expert testimony on this basis below, but argues his claim is nonetheless cognizable, because the failure to object constitutes ineffective assistance of his trial attorney. We disagree.

As we explained in *People v. Mackey* (2015) 233 Cal.App.4th 32, 119: "A defendant claiming ineffective assistance of counsel must demonstrate both deficient performance and resulting prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 691–692 (*Strickland*); *People v. Ledesma* (1987) 43 Cal.3d 171, 216–218.) On the first prong he must show that 'counsel's representation fell below an objective standard of reasonableness . . . [¶] . . . under prevailing professional norms.' (*Strickland, supra*, at p. 688.) And under the second, he must show that in the absence of the error it is reasonably probable that a result more favorable to him would have [been] obtained. A reasonable probability is 'a probability sufficient to undermine confidence in the outcome.' (*Id.* at p. 694.)"

"Whether to object to inadmissible evidence is a tactical decision; because trial counsel's tactical decisions are accorded substantial deference [citations], failure to object seldom establishes counsel's incompetence." (*People v. Hayes* (1990) 52 Cal.3d 577, 621.) Thus, "[i]f the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal." (*People v. Kraft* (2000) 23 Cal.4th 978, 1068–

26

1069.)

Here, the record does not reflect the actual reasons why defense counsel did not object to Cook's testimony regarding Verizon's RTT data. The record, however, does disclose a conceivable tactical basis for not objecting to such testimony. Counsel may have decided not to object to the RTT data testimony because he wished to emphasize the flaws in Cook's analysis on cross-examination and closing argument. As the People note, defense counsel on cross-examination was able to elicit testimony from Cook that Verizon had released a disclaimer on RTT data, namely that RTT data measurements are estimates of, rather than precise, locations of a cell phone. Additionally, during closing argument, defense counsel reminded the jury that "Verizon [W]ireless gives an actual disclaimer. . . . I read this to Mr. Cook, and he agreed with it. . . . The latitude and longitude measurements on real-time tool, that's RTT, report are derived solely from the round-trip delay measurement. They are best estimates and are not related to any GPS measurement. . . . Measurements with a high-confidence factor may be more accurate than measurements with a low-confidence factor, but all measurements contained on this report are the best estimates available, rather than a precise location. [¶] In other words, you can't use cell towers to pinpoint where someone is. Don't fall for it." Because the record suggests a possible tactical basis for not objecting to the testimony on RTT data, the ineffective assistance claim must be rejected.

But even if we believed that counsel's conduct fell below an objective standard of reasonableness, defendant cannot show it was prejudicial under the second prong of *Strickland*.

As an initial matter, defendant does not appear to argue that his testimony related to cell phone tower data, as opposed to RTT data, was

based on unreliable information. (See *People v. Garlinger* (2016) 247 Cal.App.4th 1185, 1187 ["expert testimony explaining a cell phone signal received by a certain side of a cell tower must have come from that side of the tower and in the general vicinity of the tower does not describe a new scientific technique subject to the standard set forth by our Supreme Court in [*Kelly, supra,*] 17 Cal.3d 24 for admitting the results of such techniques"].) We acknowledge that the cell tower data is less precise than the RTT data purported to be. Nonetheless, as now explained, because the cell tower data established the same relevant facts as the RTT data, defendant has failed to establish counsel's failure to object to testimony about RTT data was prejudicial.

As the People assert, even without testimony about Verizon's RTT data, the jury would have still heard testimony that cell phone tower data linked defendant's phone to the crime scene. Specifically, the cell phone tower data demonstrated that data events recorded on, and calls made from, defendant's phone between 10:05 p.m. and 10:13 p.m. on December 11, 2019—minutes after Robinson's car was recorded to have suffered a catastrophic event at 10:01 p.m.—connected to cell towers located in the vicinity of where the car went off the road on Mount Veeder Road. This evidence raised a strong inference that defendant was near the crime scene around the time Robinson's car fell off the roadway.

Apart from Cook's testimony, other evidence presented by the prosecution strongly, if not overwhelmingly, connected defendant to the charged crimes. And the defense case was weak in comparison. Robinson's testimony stands as direct evidence that defendant assaulted and attempted to murder her on December 11, 2019. There was circumstantial evidence that amply corroborated Robinson's testimony. This included the testimony

of several witnesses, including medical personnel and law enforcement, regarding Robinson's injuries when she was found the morning after the incidents, as well as the testimony of an orthopedic surgeon who found her injuries consistent with being hit by a car and tumbling down an embankment. GPS data from Robinson's vehicle also matched her description of her vehicle's path of travel on the night in question. In addition, damages to Robinson's vehicle were consistent with it having hit a person. On top of all that, as discussed further below, defendant had an apparent motive to kill Robinson: his anger towards her for calling and threatening to call his parole officer and his determination not to go back to prison.

Accordingly, we conclude that defense counsel's failure to object to testimony about the RTT data did not prejudice defendant. Defendant has thus failed to establish his counsel rendered ineffective assistance.

**Admission of Evidence of Prior Domestic Violence**

Defendant next argues the trial court abused its discretion in admitting evidence of uncharged domestic violence incidents that occurred before the charged incidents in this case.

### *Additional Background*

Prior to trial, the People moved in limine to introduce evidence of prior incidents of domestic violence. The first was in October 2015, when defendant beat Robinson and choked her. The next set of incidents occurred in November 2019, when defendant broke her phone and then later hurt her arm in attempt to keep her from leaving her apartment.

At oral argument on the motion, defense counsel objected to the evidence on section 352 grounds. Over that objection, the trial court allowed the evidence to come in. Robinson, as well as her coworkers and friend, gave testimony pertaining to the two prior incidents.

29

***The Law***

Section 1101, subdivision (a) provides that "evidence of a person's character or a trait of his or her character . . . is inadmissible when offered to prove his or her conduct on a specified occasion." Section 1109, subdivision (a)(1) provides an exception to that rule: "[I]n a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352." (See *People v. Villatoro* (2012) 54 Cal.4th 1152, 1159.)

And under section 352, the trial court has discretion to exclude evidence "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." " 'In applying section 352, "prejudicial" is not synonymous with "damaging." ' " (*People v. Karis* (1988) 46 Cal.3d 612, 638 (*Karis*).) Instead, prejudice under section 352 refers to evidence " 'which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.' " (*Karis*, at p. 638; see *People v. Rucker* (2005) 126 Cal.App.4th 1107, 1119.)

If evidence is admitted under section 1109, and by extension, section 352, a trier of fact may infer from the evidence that the defendant had a disposition or propensity to commit other offenses involving domestic violence, and that the defendant was likely to commit and did commit the current domestic violence offense. (See *People v. Ogle* (2010) 185 Cal.App.4th 1138, 1143; *People v. Johnson* (2010) 185 Cal.App.4th 520, 528.)

We review a challenge to a trial court's decision to admit such evidence for abuse of discretion. (*People v. Hamilton* (2009) 45 Cal.4th 863, 929–930;

*People v. Branch* (2001) 91 Cal.App.4th 274, 281–282.) As to what a showing of such abuse requires, it has been described in terms of a decision that "exceeds the bounds of reason" (*People v. Beames* (2007) 40 Cal.4th 907, 920), or one that is arbitrary, capricious, patently absurd, or even whimsical. (See, e.g., *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 390 [" ' "arbitrary, capricious, or patently absurd" ' "]; *People v. Benavides* (2005) 35 Cal.4th 69, 88 (*Benavides*) [ruling " ' "falls 'outside the bounds of reason' " ' "].)

### *Analysis*

In support of his claim that the trial court abused its discretion in admitting evidence of prior domestic violence, defendant asserts three sub-arguments: first, that the court failed to address all the factors it was purportedly required to weigh in determining whether to admit the evidence under section 352; second, that the evidence was inadmissible under section 352 in any event; and third, that the evidence was not justified by the purposes underlying section 1109. We address each argument in turn.

On the first sub-argument, "when ruling on a section 352 motion, a trial court need not expressly weigh prejudice against probative value, or even expressly state that it has done so. All that is required is that the record demonstrate the trial court understood and fulfilled its responsibilities under . . . section 352." (*People v. Williams* (1997) 16 Cal.4th 153, 213; accord, *People v. Padilla* (1995) 11 Cal.4th 891, 924 ["[A]s the cases reflect, we are willing to infer an implicit weighing by the trial court on the basis of record indications well short of an express statement"], overruled on other grounds in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.)

The record here so demonstrates. During oral argument on the People's motion in limine to admit evidence of the prior domestic violence

31

incidents, defense counsel objected to the evidence pursuant to section 352. The court responded, "I'm going to grant the request that [Robinson] may testify about the 2015 and 2019 . . . incident occurring prior to the issue in question." The prosecutor then attempted to raise another point regarding the prior incidents, but was interrupted when the court had an off-the-record discussion with the clerk. When the court went back on the record, it then allowed defendant and his attorney to have further off-the-record discussions regarding the evidence. The court then went back on the record and stated, "The objection is noted and the Court has ruled those two incidents may be testified about by the alleged victim." Although the trial court did not expressly weigh prejudice against probative value, we may infer from its acknowledgment of defendant's objection based on section 352 and its decision to admit the evidence over that objection that it was aware of the section 352 issue and thus its weighing duty under the statute. (See *People v. Williams*, *supra*, 16 Cal.4th at p. 214.)

This leads us to defendant's second sub-argument that the admission of the evidence of prior domestic violence incidents "violated Section 352." Citing *People v. Nguyen* (2010) 184 Cal.App.4th 1096, 1117, defendant argues that the following factors weighed in favor of excluding the evidence of prior domestic violence: "(1) the probative value of the uncharged acts, which includes a consideration whether the acts increased in frequency and severity; (2) whether the uncharged acts are remote; (3) the degree of certainty that the uncharged acts actually occurred; (4) whether the jury would be tempted to punish the defendant for the uncharged acts, thus confusing the issues; (5) whether the uncharged acts are cumulative on the issue of propensity; (6) whether admission will consume an undue amount of time." We disagree.

Despite defendant's contentions otherwise, the probative value of the evidence was great. The prior acts of domestic violence involving defendant were substantially similar—they all involved arguments and threats of violence against Robinson and resulted in physical injury to her. The 2015 incident was especially similar in that it involved defendant beating and choking Robinson.

In addition, the prior incidents were not remote in time. The October 2015 incident occurred within five years of the charged incidents. The November 2019 incidents occurred in the month before the charged incidents.

Moreover, although Robinson was the only direct witness of the prior incidents, the testimony of her coworkers and friend regarding their observations following the incidents gave Robinson's version of the incidents independent reliability. (See *People v. Ewoldt* (1994) 7 Cal.4th 380, 404–405 (*Ewoldt*), superseded by statute on other grounds as stated in *People v. Britt* (2002) 104 Cal.App.4th 500, 505.) They testified that after each incident Robinson had injuries consistent with having been beaten, appeared emotionally distraught, and expressed fear of defendant.

On the other side of the scale, defendant argues that the prejudicial effect of this evidence is heightened by the circumstance that defendant's uncharged acts did not result in criminal convictions, because such circumstance may have increased the danger that the jury might have been inclined to punish defendant for the uncharged offenses, regardless whether it considered him guilty of the charged offenses, and increased the likelihood of confusing the issues.

At the same time, however, the testimony describing defendant's uncharged acts was no stronger and no more inflammatory than the testimony concerning the charged offenses. "This circumstance decreased the

33

potential for prejudice, because it was unlikely that the jury disbelieved [Robinson's] testimony regarding the charged offenses but nevertheless convicted defendant on the strength of . . . [Robinson's] testimony regarding the uncharged offenses, or that the jury's passions were inflamed by the evidence of defendant's uncharged offenses." (*Ewoldt*, *supra*, 7 Cal.4th at p. 405.)

Lastly, as defendant acknowledges, "[e]vidence about these incidents and their aftermath did not consume an inordinate amount of time."

Considering all of the circumstances, we conclude the trial court did not abuse its discretion in declining to exclude evidence of defendant's prior domestic violence under section 352. It follows the court properly admitted the evidence under section 1109.

We are not convinced otherwise by defendant's argument that the admission of the evidence "was not justified by the purposes behind Section 1109." (Capitalization omitted.) He cites *People v. Brown* (2000) 77 Cal.App.4th 1324, 1333, which references a bill analysis in the legislative history of section 1109 stating: "Proponents argue that in domestic violence cases, as in sexual offense cases, special evidentiary rules are justified because of the distinctive issues and difficulties of proof in this area." Such difficulties of proof, defendant continues, are reflected by " 'uncooperative victims' " who " 'may refuse to testify, who recant previous statements, or whose credibility is attacked by defense questions on why they remained in a battering relationship.' " (*People v. Brown* (2004) 33 Cal.4th 892, 899 (*Brown*).) Defendant argues that "[t]here were none of these 'difficulties of proof' in this case," because Robinson took the stand at trial and did not recant her statements concerning the incidents. Nor did the defense, defendant contends, question why Robinson stayed with Martin despite the

34

prior abuse.

Preliminarily, we note that defendant did not object to the evidence on this basis, thereby forfeiting his claim on appeal. Section 353 requires a party's objection to evidence to be "timely made and so stated as to make clear the specific ground of the objection." (§ 353, subd. (a).) The Supreme Court has " 'consistently held that the "defendant's failure to make a timely and specific objection" on the ground asserted on appeal makes that ground not cognizable. [Citations.]' " (*People v. Partida* (2005) 37 Cal.4th 428, 434 (*Partida*).) Notwithstanding defendant's forfeiture of his argument under section 1109, we reject it on the merits.

As a general matter, the authority defendant cites does not establish the proposition that evidence of prior domestic violence incidents is admissible under section 1109 only where the alleged victim refuses to testify or recants his or her statements, or where the victim's credibility is questioned on the basis of the victim remaining in a battering relationship. In any event, contrary to defendant's assertions, the "difficulties of proof" he refers to were presented in this case. The record demonstrates that defense counsel *did* attack Robinson's credibility based on her failure to report the prior incidents and her decision to stay in a relationship with defendant. On cross-examination of Robinson, defense counsel questioned her about why she did not report to police or take photos of her injuries from the incidents and how she married defendant even after the first incident in 2015. Defense counsel maintained this theme throughout closing statements. We thus reject defendant's argument that the admission of such evidence "was not justified by the purposes of section 1109."

But even assuming the evidence was improperly admitted, any such error was harmless under the standard set forth in *People v. Watson* (1956)

35

46 Cal.2d 818 (*Watson*). (See *People v. Marks* (2003) 31 Cal.4th 197, 226–227 ["the application of ordinary rules of evidence like Evidence Code section 352 does not implicate the federal Constitution, and thus we review allegations of error under . . . *Watson*"]; accord, *People v. Fudge* (1994) 7 Cal.4th 1075, 1102–1103.) Under the *Watson* standard, an error is prejudicial only if "it is reasonably probable that a result more favorable to the [defendant] would have been reached in the absence of the error." (*Watson*, *supra*, 46 Cal.2d at p. 836.)

Here, it is not reasonably probable that defendant would have obtained a favorable verdict had the court excluded evidence of the prior domestic violence incidents. As explained above, evidence of defendant's guilt was strong. (See *ante*, pp. 30–31.) Furthermore, the court instructed the jury that they could consider evidence of the prior domestic violence, but for a limited purpose. It gave CALCRIM No. 352A, which permits but does not require the jury to infer that the defendant was predisposed to commit the charged crime if the jury finds by a preponderance of the evidence that the defendant committed uncharged domestic violence. It admonishes that a finding of prior domestic violence is not sufficient by itself to prove the defendant guilty of the charged crime; such a finding, should it be made, is only one factor to be considered with the other evidence. And this instruction clearly states that the prosecution must still prove "each charge and allegation beyond a reasonable doubt."

Given these circumstances, we see no reasonable possibility of a verdict more favorable to defendant, even in the absence of the testimony about prior domestic violence.

For the first time on appeal, defendant also claims the trial court's evidentiary ruling violated his due process rights. Assuming this claim was

36

preserved on appeal, it fails.  It is well established that "generally, violations of state evidentiary rules do not rise to the level of federal constitutional error." (*Benavides*, *supra*, 35 Cal.4th at p. 91; accord, *People v. Jones* (2013) 57 Cal.4th 899, 957 ["the routine application of provisions of the state Evidence Code law does not implicate a criminal defendant's constitutional rights"].)  Here, "[t]he trial court did not err under state law, and defendant does not provide any persuasive reason for us to conclude that the application of California's rules of evidence violated his constitutional rights, nor does he establish any basis for concluding that the admission of this evidence rendered the jury's . . . verdict unreliable." (*People v. Prince* (2007) 40 Cal.4th 1179, 1238–1239 (*Prince*).)

**Admission of Expert Testimony on Intimate Partner Battering**

Defendant's third evidentiary challenge is that the trial court abused its discretion in admitting expert testimony concerning the effects of intimate partner battering.

### *Additional Background*

Prior to trial, the prosecution moved in limine to admit such evidence under section 1107.  The prosecution's justification for doing so was that "[t]here are many myths and misperceptions about domestic violence in our society, about why a victim may refuse to report violence, even lie to protect his or her partner, and why a victim would stay with his or her abuser. . . . The People are requesting an expert witness to educate the jury in general about domestic violence, types of violence, and common patterns and cycles of violence, as well as strangulation within domestic violence."

During argument on the motion, defense counsel stated, "I'll lodge an objection, just for the record, on that one."  The court admitted the proposed expert testimony over that objection.

As detailed above, Melissa Kelly, an investigator with the Napa County

37

District Attorney's Office, testified for the prosecution as an expert in intimate partner violence. She explained the "power and control tactics" of abusers that are commonly seen in domestic violence cases she has investigated. She also testified as to the "cycle of violence" in abusive relationships between intimate partners. Additionally, Kelly testified that victims, for various reasons, often stay in a relationship despite being abused. Similarly, she testified that victims often fail to report or delay in reporting incidents of abuse for various reasons.

### *The Law*

Section 801 permits expert testimony "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (§ 801, subd. (a).) Section 1107 concerns a specific type of expert opinion testimony. It states expert testimony concerning "intimate partner battering and its effects, including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence" is admissible in a criminal action "except when offered against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge." (§ 1107, subd. (a).)

"The effects of intimate partner battering, frequently, albeit inartfully, referred to as 'battered women's syndrome,' have been defined as ' " 'a series of common characteristics that appear in women [or men] who are abused physically and psychologically over an extended period of time by the dominant male [or female] figure in their lives.' " ' " (*In re Walker* (2007) 147 Cal.App.4th 533, 545–546 & fn. 11, citing *People v. Humphrey* (1996) 13 Cal.4th 1073, 1083–1084 (*Humphrey*); see *People v. Romero* (1994) 8 Cal.4th 728, 735, fn. 1 ["the effects of intimate partner battering manifest

38

as ' "a 'pattern of responses and perceptions presumed to be characteristic of [individuals] who have been subjected to continuous physical abuse by their mate[s]' " ' "].)

There are two components to the relevance analysis in this context. First, there must be sufficient evidence to support the theory that the effects of intimate partner battering applies to the victim. (*People v. Gadlin* (2000) 78 Cal.App.4th 587, 592 (*Gadlin*).) Second, there must be a contested issue to which the testimony is probative, other than whether a criminal defendant committed charged acts of domestic violence. (*Ibid.*)

Expert testimony on intimate partner battering is generally relevant and admissible "to explain that it is common for people who have been physically and mentally abused to act in ways that may be difficult for a layperson to understand." (*People v. Riggs* (2008) 44 Cal.4th 248, 293 (*Riggs*); see *People v. Kovacich* (2011) 201 Cal.App.4th 863, 903 ["expert testimony on domestic violence may include general descriptions of abuser behavior in order to 'explain the victim's actions in light of the abusive conduct' "].) "The relevance of this evidence is based on the possibility that the jurors will doubt that a witness who claims to have been abused has indeed acted in the manner to which he or she testified, and therefore the jurors might unjustifiably develop a negative view of the witness's credibility." (*Riggs*, *supra*, 44 Cal.4th at p. 293, citing *Brown, supra,* 33 Cal.4th at pp. 906–908; see *Humphrey*, *supra*, 13 Cal.4th at p. 1087 [intimate partner battering evidence may assist the jury by dispelling commonly held misconceptions about battered victims, including that victims are free to leave their abusers at any time].)

As with the other evidentiary rulings challenged by defendant, the trial court's decision to admit the expert testimony is reviewed for abuse of

discretion.  (See *Prince, supra*, 40 Cal.4th at p. 1222; *People v. Kovacich, supra*, 201 Cal.App.4th at p. 902.)

### *Analysis*

Defendant raises essentially three arguments challenging the admissibility of the intimate partner battering evidence.  First, he contends the evidence lacked foundation and was irrelevant under section 1107.  Second, he argues the evidence was inadmissible under section 801 because the subject of intimate partner battering is not beyond the common experience of jurors.  Third, defendant maintains that the expert testimony constituted improper profile evidence.

As a threshold matter, the People contend that defendant has forfeited all of these contentions because his counsel at trial did not raise objections on the grounds asserted on appeal.  Defense counsel stated he was "lodg[ing] an objection" to admitting the evidence at issue, but he did not specify any grounds for the objection.  As noted, an objection to evidence that does not specify the ground asserted on appeal makes that ground not cognizable.  (*Partida, supra*, 37 Cal.4th at p. 434; § 353, subd. (a).)  Thus, defendant's failure to specify any grounds for his objection to the expert testimony, much less the grounds raised on appeal, renders his appellate claims not cognizable.

Even if we were to reach the merits of defendant's claims, we find them unpersuasive.

We first disagree with defendant that the evidence on the effects of intimate partner battering lacked foundation and was not relevant under section 1107.  He argues "the evidence was not probative on a contested issue," because the prosecution "presented little evidence the behaviors Kelly described, such as rationalization, failure to report crimes, recantation,

40

reconciliation, had any impact on Robinson's response to the charged offense[s] and the defense did not lean on these behaviors to attack Robinson's credibility." In a related argument, defendant asserts the evidence was not relevant because "the prosecutor did not show there was a common myth or misconception Kelly's testimony would rebut" in connection with the charged offenses.

Initially, we note defendant does not deny that the evidence at trial suggested Robinson's and defendant's relationship involved a struggle for power and control between them, or a "cycle of violence," as described by Kelly. In addition, defendant agrees that Kelly's testimony was relevant to explain her "earlier failures": her delay in reporting the prior domestic violence incidents and resuming her relationship with defendant despite the violence. Yet, defendant claims that Robinson's decision to promptly report the charged incidents and cooperate with the prosecution at trial somehow rendered Kelly's testimony irrelevant under section 1107. This argument fails.

Even if Robinson did not fail to report the charged incidents, her credibility nonetheless remained at issue, in light of her "earlier failures" to promptly report the uncharged incidents and her decision to stay in a relationship despite the violence. And, contrary to defendant's assertions otherwise, the defense at trial did challenge Robinson's credibility on those grounds. The People correctly observe that "[a]s part of its defense strategy of discrediting Robinson's account of what happened on December 11, [defendant's] counsel argued that she lied in her testimony about [defendant] harming her on the two prior occasions." As explained above, defense counsel on cross-examination of Robinson questioned her regarding her failure to report the prior incidents and decision to marry defendant despite the abuse.

41

Counsel stuck with this theme during closing argument, focusing on Robinson's failures to immediately report the prior incidents. Additionally, defense counsel questioned Robinson's state of mind at the time of the charged incidents, arguing that she did not act in a manner consistent with her stated fear of defendant. Counsel argued, "[I]f you're so afraid that [defendant's] going to kill you, why get in the car with him and have him drive?" Rather than someone fearful of defendant, counsel described Robinson as "suicidal," thus suggesting she voluntarily had driven her car down the ravine.

Thus, Kelly's expert testimony was relevant to explain Robinson's behaviors that were seemingly inconsistent with her testimony about suffering abuse, and therefore, to assess her credibility. (See *Riggs*, *supra*, 44 Cal.4th at pp. 293–294; *Humphrey*, *supra*, 13 Cal.4th at pp. 1087–1088.) In other words, the evidence was probative to show Robinson was a battered victim at the time of both the uncharged and charged incidents.

*Gadlin*, a case defendant cites, actually undermines his position. There, the court held that expert testimony on intimate partner battering was relevant, even when the victim was not recanting at trial, but cooperating with the prosecution. (*Gadlin*, *supra*, 78 Cal.App.4th at pp. 594–595.) The defendant and victim had "a troubled, 'off-again, on-again' relationship for two and one-half years . . . ." (*Id.* at p. 590.) In June 1993, the defendant came home under the influence of drugs, tried to choke the victim, dragged her into a bedroom, and was holding a knife to her neck when police arrived. The victim later wrote a letter of recantation to the parole board on defendant's behalf. Following a one-year period of incarceration for a parole violation, defendant and the victim reunited. In July 1994, when the victim tried to end the relationship, the defendant pushed her to the floor;

grabbed a knife; and cut the victim from her temple to the middle of her cheek and on her back, neck, abdomen; and he cut three of her fingers. (*Ibid*.) The defendant was charged with, and later convicted of, assault with a deadly weapon based on the 1994 incident. (*Id*. at pp. 589, 590.)

*Gadlin* held that intimate partner battering evidence "was probative regarding both the victim's recantation of a prior incident and her decision to resume the relationship with the defendant before the charged incident." (*Gadlin*, *supra*, 78 Cal.App.4th at p. 589.) It explained, "Both sides sought admission of the prior incident, and the recantation was pivotal in the defense attack on the victim's credibility." (*Id*. at p. 594.) The defense attacked the victim's credibility in opening statement, throughout trial, and in closing statement. (*Ibid*.) The court explained that the expert testimony "was properly admitted here despite the victim's cooperation with the prosecution at the trial because the attack on her credibility was based on her state of mind at the time of the charged and uncharged incidents. . . . [T]he victim was a battered woman at that time." (*Ibid*.)

*Gadlin* is analogous to this case. Here, as in *Gadlin*, the victim's credibility was a critical issue. The evidence showed that Robinson responded to her abuse by defendant in ways that a layperson might view as inconsistent with an abused victim—she failed to report prior incidents of abuse and continued to remain in an intimate relationship with defendant. Also, the defense in this case expressly contested Robinson's credibility along these lines. Thus, as in *Gadlin*, the expert testimony on intimate partner battering was properly admitted despite Robinson's cooperation with the prosecution at trial, because the attack on her credibility was based on her state of mind at the time of the charged and uncharged incidents. The court

43

here thus properly admitted Kelly's testimony under section 1107.[3]

Turning to the argument under section 801, defendant claims that the effects of intimate partner battering is not a proper subject for expert testimony because it is not beyond the common knowledge of jurors. (§ 801, subd. (a) [expert testimony admissible if it is "[r]elated to a subject that is sufficiently beyond common experience"].) Defendant contends that because the public is more aware today of the dynamics of domestic violence than it was when section 1107 was enacted in 1991, the prosecution failed to show that Kelly's testimony was beyond the common knowledge of the average juror. This argument lacks merit. The use of expert testimony to explain the effects of intimate partner battering is statutorily authorized by section 1107. As such, the Legislature has determined that intimate partner battering is a proper subject for expert testimony. Further, our Supreme Court has upheld the admission of such expert testimony under section 1107 or section 801, or both. (See *Humphrey*, *supra*, 13 Cal.4th at p. 1088; *Brown*, *supra*, 33 Cal.4th at pp. 895–896, 905.) As the People assert, defendant's assertion essentially

---

[3] Defendant's citations to cases outside the context of intimate partner battering do not assist his position. *People v. Lavergne* (1971) 4 Cal.3d 735 is readily distinguishable, as it held that a party may not cross-examine a witness on irrelevant matters for the purpose of eliciting something to be contradicted. This rule does not apply here because Robinson was not impeached on a collateral matter. Defendant also cites *People v. Jones* (2013) 57 Cal.4th 899 for the proposition that "a party must present more than argument about the myth or misconception it seeks to rebut." But here, as explained, there was evidence, not merely argument, that certain misconceptions surrounding victims of domestic violence were at play. Even further removed from the issue are *People v. Bonin* (1988) 46 Cal.3d 659, 698 and *People v. Wilson* (2005) 36 Cal.4th 309, 354, which dealt with the failure to instruct on the meaning of the penalty "life without possibility of parole" and thus had nothing to do with the admissibility of intimate partner battering evidence or other similar type of psychological evidence.

"is a policy argument that should be directed to the Legislature. This court's function is to interpret the law, not pass on its wisdom."

Finally, we disagree with defendant that Kelly's testimony should have been excluded as improper profile evidence. "A profile ordinarily constitutes a set of circumstances—some innocuous—characteristic of certain crimes or criminals, said to comprise a typical pattern of behavior. In profile testimony, the expert compares the behavior of the defendant to the pattern or profile and concludes the defendant fits the profile." (*Prince, supra*, 40 Cal.4th at p. 1226.)

Defendant relies primarily on *People v. Robbie* (2001) 92 Cal.App.4th 1075, 1084 (*Robbie*), which holds that "[p]rofile evidence is generally inadmissible to prove guilt." In *Robbie*, the defendant was charged with kidnapping for sexual purposes and other sex offenses. (*Id.* at pp. 1077–1078.) At trial, the defendant maintained that his sexual encounter with the victim was consensual. (*Id.* at pp. 1079–1080.) In an effort to overcome this defense, the prosecution offered an expert on sexual offenders "to testify that . . . defendant's conduct was consistent with being a rapist." (*Id.* at p. 1081.) In the form of hypothetical questions asked by the prosecutor, the expert testified that many rapists use only minimal force, and described in detail a scenario in which the rapist is in effect acting as if he thinks of the sexual acts as consensual. (*Id.* at pp. 1082–1084.) Not coincidentally, the behavior the expert described matched the testimony of the alleged victim. Then, when asked "what if any conclusion do you reach about that conduct?" the expert answered, "That it's the most prevalent type of behavior pattern that I have seen with sex offenders. It's the most common type of behavior pattern." (*Id.* at p. 1083.) The Court of Appeal in *Robbie* characterized this evidence as inadmissible "profile evidence." It explained: "[The evidence]

implies that criminals, and only criminals, act in a given way.  In fact, certain behavior may be consistent with both innocent and illegal behavior, as the People's expert conceded here." (*Id.* at p. 1085.)

The court in *Robbie* distinguished its case from *People v. McAlpin* (1991) 53 Cal.3d 1289 (*McAlpin*).  (*Robbie, supra*, 92 Cal.App.4th at pp. 1086–1087.)  In *McAlpin*, the defendant who was accused of child molestation presented extensive evidence showing he was a respectable member of the community.  A police officer with experience in child molestation investigations testified for the prosecution that there is no profile of a typical child molester; a child molester "can be of any social or financial status, any race, any age, any occupation, any geographical origin, and any religious belief or no religious belief at all," as well as "persons of good or even impeccable reputations in the community."  (*McAlpin, supra*, 53 Cal.3d at p. 1299.)  Our Supreme Court held the trial court properly admitted this evidence because it refuted a common stereotype of child molesters.  (*Id.* at pp. 1300, 1302–1304.)  The *Robbie* court explained, "The evidence in *McAlpin* was not admitted for [an] improper purpose.  It was not offered to establish a stereotype, then condemn the defendant for fitting it.  Instead, the *McAlpin* evidence was admitted in recognition that a misleading notion existed in the public consciousness and to disabuse jurors of the misconception."  (*Robbie*, at p. 1087.)

In our view, the expert testimony here is closer to *McAlpin* than to *Robbie*.  The gist of Kelly's testimony about perpetrators of domestic violence was that there was no profile of a typical perpetrator.  Kelly described, in general fashion, tactics used by abusers to exert power and control over their victims that are commonly seen in domestic violence cases.  It is true that Kelly was asked in the form of hypotheticals to consider examples of

46

behaviors that paralleled Robinson's descriptions of defendant's conduct towards her. However, this testimony was always given in the context of explaining the impact such behaviors would likely have on a victim. As she put it, the "power and control tactics wheel" is a tool to "help . . . understand why someone is either staying in a relationship or denying that there is violence in a relationship. So this is a . . . visual relationship of some tactics that we will often see but it's not . . . a clear-cut science that we're going to see this every time." In addition, Kelly who had never met defendant, did not suggest that any behaviors that could be attributed to defendant were the "most prevalent" or the "most common" type seen in abusers. Nor did she offer an opinion as to whether such behaviors established that defendant was an abuser. Instead, Kelly explained that not all of the power and control tactics are present in every case of domestic violence, because "[t]he dynamics of every relationship is different." "[S]ome of these tactics may be used by some perpetrators of domestic violence and not by others. Some of them may not apply." She also explained that not every domestic violence case involves physical injury. Additionally, Kelly testified there is no particular profile of a domestic violence victim. Thus, even though parts of Kelly's testimony appear at first blush to fit the "profile" mold, in fact they do not.

For similar reasons, defendant also misplaces reliance on *People v. Martinez* (1992) 10 Cal.App.4th 1001 (*Martinez*). There, the defendant was arrested for driving a stolen truck. (*Id.* at p. 1003.) The *Martinez* court held the trial court erred in permitting the prosecution to introduce the testimony of highway patrol investigators regarding theft rings that transported stolen vehicles to Central America to prove the defendant knew the car he bought was stolen. (*Id.* at pp. 1007–1008.) Here, as we have already stated, Kelly's testimony was not used to show that defendant fit the profile of a criminal

47

and therefore he was guilty of the crimes charged.

But even if Kelly's testimony amounted to profile evidence under *Robbie* or *Martinez*, this did not mean her testimony was inadmissible. *Robbie* and *Martinez* predate our Supreme Court's decision in *People v. Smith* (2005) 35 Cal.4th 334 (*Smith*), disapproved on another ground in *People v. Beck and Cruz* (2019) 8 Cal.5th 548, 670. The court in *Smith* explained that " '[p]rofile evidence' . . . is not a separate ground for excluding evidence"; like, other evidence, it is admissible "only if it is either irrelevant, lacks a foundation, or is more prejudicial than probative." (*Smith*, *supra*, 35 Cal.4th at p. 357.) Two years later, in *Prince*, the Supreme Court quoted that passage from *Smith* and reiterated that "profile evidence does not describe a category of always-excluded evidence," but rather is subject to exclusion only if it meets the criteria set forth in *Smith*. (*Prince*, *supra*, 40 Cal.4th at p. 1226.)

Thus, under *Smith* and contrary to *Robbie* and *Martinez*, classifying certain testimony as profile evidence is not sufficient to establish its inadmissibility. Rather, the testimony must still be shown to be inadmissible on some other ground, such as relevance, foundation, or prejudicial effect that outweighs its probative value. As noted, defendant did not object to the admissibility of profile evidence on any of those grounds in the trial court, so he has forfeited any such objections. (*Partida, supra,* 37 Cal.4th at p. 434.) Likewise, on appeal, he does not argue that the evidence was more prejudicial than probative. Although he does argue on appeal that the evidence lacked foundation and was irrelevant, we have rejected those contentions above. Defendant therefore has not shown that the evidence was inadmissible under *Smith*, by which we are bound.

In any event, assuming the admission of the purported profile evidence

was erroneous, it was harmless. In *Robbie* and *Martinez*, the admission of the profile evidence was not harmless because each case was closely balanced. (See *Robbie*, *supra*, 92 Cal.App.4th at pp. 1087–1088 [both the victim and the defendant testified at trial, giving "starkly conflicting versions of events"; the victim admitted lying about certain events; and other witnesses testified that she was untruthful and that she used drugs]; *Martinez*, *supra*, 10 Cal.App.4th at p. 1008 ["[t]he issue of defendant's knowledge and intent, being dependent upon circumstantial evidence, was close"].) Also, in *Robbie*, the only evidence corroborating the victim's claim of rape (contrasted with the defendant's claim of consensual sex) was a witness who said the victim had mentioned the defendant's white truck while talking on the phone the evening of the alleged rape, and other witnesses who described her as upset after the incident. (*Robbie*, at pp. 1077–1078, 1088.) Here, on the other hand, there was significant evidence that amply corroborated Robinson's account of the charged incidents, as discussed above. (See *ante*, pp. 30–31.)

Further, contrary to defendant's assertions, the prosecutor's statements during closing argument did not urge the jury to find defendant guilty based on Kelly's testimony. Although the prosecutor drew parallels between the power and control tactics described by Kelly and defendant's actions, she did so for the purpose of explaining Robinson's apparently self-impeaching behaviors. The prosecutor stated, "You . . . heard from Investigator Melissa Kelly, who talked about both the power and control wheel and the cycle of violence to help give some context to some of [Robinson's] decisions and the experiences she was having in this relationship and why she acted the way she did." She continued, "You see—and we mentioned the cycle of abuse so that you understand [Robinson], why she kept going back to this relationship,

49

why she stayed. She told you how much she loved him, and how much she thought things might change." Read in context, the prosecutor's argument was that Robinson's delay in disclosing prior incidents of abuse and her resumption of a relationship with defendant did not necessarily indicate that her allegations should be discredited.

In short, any error in admitting expert testimony on intimate partner battering was harmless.

**Failure to Sua Sponte Instruct the Jury with CALCRIM No. 850**

Defendant argues the trial court erred in failing to sua sponte instruct the jury with CALCRIM No. 850, which states, in pertinent part: "Testimony as to [the effects of intimate partner battering] is offered only to explain certain behavior of an alleged victim of domestic abuse. [¶] [It] is not evidence that the defendant committed any of the crimes charged against [Robinson] [or any conduct or crime[s] with which [defendant] was not charged]. [¶] You may consider this evidence only in deciding whether or not [Robinson's] conduct was consistent with the conduct of someone who has been abused and in evaluating the believability of (her) testimony."

The bench notes to CALCRIM No. 850 discuss a court's instructional duty: "Several courts of review have concluded there is no sua sponte duty to give a similar limiting instruction (see CALCRIM No. 1193, *Testimony on Child Sexual Abuse Accommodation Syndrome* [(CSAAS)]) when an expert testifies on child sexual abuse accommodation syndrome. [Citations.]" The bench notes cite several cases, including, among others, *People v. Mateo* (2016) 243 Cal.App.4th 1063, 1073–1074 (*Mateo*), which held that the trial court was required to give CALCRIM No. 1193 only upon request, and *Humphrey, supra,* 13 Cal.4th at p. 1088, fn. 5, which states, "If the prosecution offers the battered women's syndrome evidence, an additional

50

limiting instruction might also be appropriate on request . . . ." The bench notes also cite *People v. Housley* (1992) 6 Cal.App.4th 947, 958–959 (*Housley*), in which a panel of this Division concluded there is a sua sponte duty to give a CALCRIM No. 1193.

Defendant argues that our Supreme Court's statement in *Humphrey* is mere dictum. The People argue that our holding in *Housley* is "out of step with other authority" and, in any event, "[d]icta of our Supreme Court are highly persuasive" (*People v. Wade* (1996) 48 Cal.App.4th 460, 467) and should be followed. We need not decide whether the trial court was required to give CALCRIM No. 850 absent a request because, in the circumstances of this case, it is not reasonably probable that the result would have been different had the court given the instruction. (See *Mateo*, *supra*, 243 Cal.App.4th at p. 1074 [even assuming court erred in failing to give limiting instruction on CSAAS, error was harmless under *Watson* standard]; *Housley*, *supra*, 6 Cal.App.4th at p. 959 [reaching similar conclusion].)

The *Mateo* court concluded no prejudice was shown by the failure to instruct, reasoning that "[w]here, as here, the expert testifies regarding the behavior of abused children as a class, there is little, if any, chance the jury will misunderstand or misapply the evidence." (*Mateo*, *supra*, 243 Cal.App.4th at p. 1074.) In *Housley*, we concluded that, even if a sua sponte instruction had been provided, there was no reasonable probability of a more favorable result because the CSAAS testimony was presented in general terms, it was clear that the expert had no contact with the victim or knowledge of the underlying facts, and under such circumstances the jury would not have misunderstood or misapplied the expert testimony as proof that the victim was in fact sexually abused. (*Housley*, *supra*, 6 Cal.App.4th at p. 959.)

Similarly, in this case, it is not likely the jury was misled or confused by Investigator Kelly's testimony on intimate partner battering. As explained *ante*, Kelly stated she did not meet defendant, her testimony was couched in general terms, and she did not express any opinion as to whether defendant had committed the charged or uncharged incidents. Her testimony was provided within the context of explaining the impact certain behaviors would likely have on a victim, rather than characterizing the abuser. As was the portion of the prosecutor's closing argument recounting Kelly's testimony. Moreover, the jury was instructed that it was not required to accept the expert's opinions as true or correct, that it had to determine the meaning and importance of any opinion, and that it could disregard any opinion that it found unbelievable, unreasonable, or unsupported by the evidence. Given these circumstances, it is not reasonably probable the jury would have reached a different verdict had it been instructed with CALCRIM No. 850.

### Admission of Evidence of Prior Conviction, Incarceration, and Parole Status

Defendant next contends the trial court should have excluded evidence of his prior robbery conviction, prior incarceration, and status as a parolee as irrelevant and unduly prejudicial under section 352.

#### *Additional Background*

One of the People's motions in limine sought to admit, pursuant to section 1101, subdivision (b), two robberies defendant committed in 2007 and 2015 to prove that the attempted murder was premeditated rather than the product of mistake or accident. Separately, the People sought to introduce evidence of defendant's incarceration between 2015 and 2019 to provide the context of his and Robinson's relationship during that period, in particular to explain why there had been no domestic violence incidents between them. Finally, the People sought to admit evidence of defendant's parole status to

52

establish his motive to kill Robinson: his anger towards Robinson for having called and threatening to call his parole officer and his fear of being apprehended and going back to prison.

During oral argument on the admissibility of this evidence, the People additionally argued the evidence of the prior robberies was relevant to show "identity, the fact that [defendant] has engaged in violent acts previously." Defense counsel objected to the evidence on the grounds that it was irrelevant, and its probative value was outweighed by its prejudicial impact. With respect to the robberies, counsel argued they were not relevant because they were not similar to the charged incidents and defendant's identity was not at issue in this case.

Over these objections, the court permitted the prosecution to introduce evidence of defendant's incarceration and parole status. Such evidence, the court found, was probative, because "it is very important to know why there were no other incidents during this time frame." It also found that the probative value of the evidence was not outweighed by its prejudicial effect. The court also allowed the prosecution to present evidence of only one of the two robbery convictions for the purpose of explaining the basis of defendant's incarceration.

At trial, Robinson testified that defendant was imprisoned for robbery between 2015 and 2019, during which time they got married. The jury also saw the video of Robinson's interview with police at the hospital stating that defendant went to prison for robbing a convenience store. In addition, Robinson testified that she previously had called and threatened to call defendant's parole officer on several occasions.

### The Law

Evidence is relevant if it has "any tendency in reason to prove or

disprove any disputed fact that is of consequence to the determination of the action." (§ 210.) Section 352 applies to all relevant evidence, and a trial court may exclude evidence when its probative value is outweighed by the risk of undue prejudice. (*People v. Castro* (1985) 38 Cal.3d 301, 307; § 352.)

"Character evidence, sometimes described as evidence of a propensity or disposition to engage in a type of conduct, is generally inadmissible to prove a person's conduct on a specified occasion." (*People v. Villatoro, supra*, 54 Cal.4th at p. 1159; § 1101, subd. (a).) Character evidence includes "evidence of specific instances of [a person's] conduct." (§ 1101, subd. (a).)

"Our Supreme Court has explained that propensity evidence is prohibited not because it is irrelevant, but because it ' " 'is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge. The overriding policy of excluding such evidence . . . is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice.' " ' (*People v. Jackson* (2016) 1 Cal.5th 269, 300.)" (*People v. Jones* (2018) 28 Cal.App.5th 316, 323.)

Section 1101, subdivision (b), however, clarifies that evidence of a person's conduct is admissible when that evidence is relevant to demonstrate a fact other than character or propensity, "such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident." (§ 1101, subd. (b); *Ewoldt, supra,* 7 Cal.4th at p. 393.)

We review for abuse of discretion the trial court's ruling on relevance and admission of the evidence of the prior instances of conduct. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1057; *People v. Cole* (2004) 33 Cal.4th 1158, 1195.)

### *Analysis*

We first address the admissibility of the evidence regarding defendant's prior incarceration and parole status.

With regard to evidence of his prior incarceration, defendant contends it was irrelevant because "Robinson did not recant or refuse to testi[fy] or do anything that made her account of the charged crimes incongruous. She had failed to report the two prior incidents, but her failure to report those were not central to her credibility. . . . There was no need to provide the context of their relationship to show who was more credible."

Defendant's argument is a rehash of his earlier assertions regarding the evidence of intimate partner battering. We rejected those assertions, explaining that Robinson's credibility was placed at issue, not only by the evidence showing she may have acted in ways inconsistent with a victim of abuse, but also by the defense's explicit attacks on her credibility on that basis. And evidence that defendant had been incarcerated for a period of time during their relationship was relevant to assessing Robinson's credibility. As the People argue, "Without knowing the full context of their relationship, the jury would not understand why Robinson did not end the relationship after the incidents in 2015, why there were no abusive incidents between 2015 and 2019, or why Robinson's demeanor at work suddenly changed in 2019. Instead, they might be misled to believe Robinson and [defendant] had repaired their relationship after one bad incident and had shred a harmonious relationship until the month leading up to December 11[, 2019]." We agree with the People that the challenged evidence cleared the relatively low bar for relevance under section 210.

Also, evidence of defendant's incarceration, coupled with evidence of his parole status, was separately relevant to the issue of motive. A theory of the prosecution was that the attempted murder was motivated by defendant's

55

anger at Robinson for calling and threatening to call his parole officer and his determination not to go back to prison.  The evidence showed that prior to the incidents on December 11, 2019, Robinson had called and threatened to call defendant's parole officer; defendant was angry towards her as a result; he called her a "snitch" and told her that snitches "end up in ditches," she was "done," he knew "how to get rid of bodies"; and he insisted he was "not going back to prison."  As defendant acknowledges, courts have held that evidence of a defendant's parole status or prior incarceration may be relevant to show the defendant committed a crime out of a motive to avoid apprehension.  (See *People v. Fuiava* (2012) 53 Cal.4th 622, 668 [evidence of defendant's parole status admissible to show he knew his actions were illegal and that "he shot at Deputies . . . in order to avoid being apprehended and returned to prison"], citing *People v. Heishman* (1988) 45 Cal.3d 147, 168–169 [prior conviction and sentence properly admitted to show "defendant had in fact been 'in jail on a rape charge' and, thus, to help prove defendant's motive for killing [victim], to keep from going back to prison"], abrogated on another ground in *People v. Diaz* (2015) 60 Cal.4th 1176, 1190; *People v. Durham* (1969) 70 Cal.2d 171, 187–189 ["There is ample authority for the admission of evidence of prior criminal activity when such evidence provides considerable circumstantial proof of the actor's mental state at the time of the charged offense"].)

Defendant nonetheless argues that the evidence was not relevant because his "fear of returning to prison could have been presented without reference to his parole status."  However, defendant fails to explain how, and we are not persuaded that, the availability of other evidence renders the evidence at issue here irrelevant.

Turning to the section 352 strand of his argument, defendant claims

"[t]he link between [his] incarceration and any permissible purpose was . . . weak, whether the evidence is considered as providing context for the relationship or explaining the absence of incidents from 2015 through 2019." He then asserts, "The inference from [his] status as a parolee is stronger, but could have been supplied by other evidence." Defendant additionally argues that evidence of his incarceration and parole status was inflammatory in that it "could easily influence the jury's evaluation of the defense and could even color their consideration of Robinson's credibility."

Defendant overlooks the great probative value of the evidence. The evidence of defendant's prior incarceration was probative on Robinson's credibility, a critical issue in this case. And the evidence of his parole status, together with his prior incarceration, bore directly upon his mental state at the time of the charged crimes. Further, defendant's conclusory assertions that the evidence was inflammatory fails to demonstrate that the trial court acted outside the bounds of reason in determining that the probative value of the evidence was not substantially outweighed by any prejudicial effect. In any event, we are not convinced that the evidence was inflammatory or substantially likely to elicit an impermissible emotional response from the jury. Evidence that defendant had been incarcerated, was on parole, and did not want to go back to prison "was not so emotionally charged as to inhibit its logical evaluation by the jury." (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1092 [rejecting similar argument that evidence of a defendant's parole status should have been excluded under section 352].) The court thus did not abuse its discretion in admitting evidence of defendant's prior incarceration and parole status.

We next address the admissibility of defendant's prior robbery conviction. Defendant contends the evidence was not relevant under

section 1101, subdivision (b) to show "identity, [or] absence of mistake or accident." The People concede that the court's admission of the prior robbery conviction "was arguably erroneous" because "[p]roving the absence of accident or mistake, or identity, [was] unnecessary." The People continue, "[Defendant's] defense was not that he hit Robinson, or that if Robinson were not telling the truth, the driver was someone else. [His] defense was that he was not there during the incident at all." The People, however, argue that any error in admitting the evidence was harmless.

Given the People's concession, we will proceed on the assumption that the trial court erred by admitting evidence of the prior robbery conviction. However, we agree with the People that any such error was harmless. Robinson's testimony about defendant's robbery conviction was brief, and presented within the broader context of her relationship with defendant. Also, as defendant recognizes, "the prosecutor did not focus on this evidence as much as the domestic violence material." The record does not show that the prosecutor mentioned the prior robbery in closing summation. Rather, it was defense counsel who referred to the robbery in an attempt to establish defendant had no involvement in the charged incidents. Counsel argued that while defendant may have had "a history of a robbery," he had "no history of domestic violence." Finally, as we have already stated, the evidence of defendant's guilt was strong. (See *ante*, pp. 30–31.) Considering the strength of the case against defendant, as well as the brief references to the prior robbery, we perceive no reasonable probability of a different result if the evidence had not been admitted.

**Exclusion of Defendant's Out-of-Court Statements**

Defendant next contends the trial court abused its discretion in excluding hearsay statements he made to his parents on the evening of

December 11.  He argues the statements were admissible under section 1240, the hearsay exception for spontaneous statements.  He further asserts the exclusion of his statements deprived him of his federal constitutional right to present a complete defense.

### *Additional Background*

In opening statements, defense counsel argued that on the night of December 11, 2019, Robinson had left defendant on the side of the road at some unspecified location on the valley floor in Napa, before she drove her car up the hill on Mount Veeder Road and then off the roadway and over the ravine.  Defense counsel, on cross-examination of defendant's father Dan Lilly, attempted to elicit testimony to that end.  Counsel questioned Lilly regarding a phone call defendant had made to him at around 10:10 p.m. on December 11.  Lilly testified that during the call defendant "was talking loud. He wasn't yelling per se, but he was talking loud because of the static" before the call dropped.  When defense counsel asked, "And what did he say?" the prosecution objected on hearsay grounds.  Defense counsel countered that it fell under the "excited utterance" exception to hearsay.  The court sustained the objection, but stated it would revisit the issue at a later time.

Also during cross examination of defendant's mother Deborah Martin, defense counsel asked her if defendant had told her anything when he arrived at her house the night of December 11.  This line of questioning was again met with objections on hearsay grounds, which objections the court sustained.

During a break in the trial, the court addressed the extrajudicial statements.  Defense counsel made the following offer of proof:  "Dad would say that he heard his son after receiving a phone call that [Robinson] just left me on the side of the road."  The court then asked, "And what would mom

testify?"  Counsel responded, "For the most part, the same thing that . . . he got left on the side of the road."  Counsel offered the statements of defendant as "an excited utterance," arguing that "[i]t's a starling event being left on the side of the road in the middle of the rain."

The prosecutor objected, arguing defendant was not permitted to present "self-serving statements" and there was no evidence to support a finding they qualified as spontaneous statements.  The court agreed with the prosecutor, concluding, "I would be excluding it because it is self-serving and the law is . . . clear on that issue, that that can't be introduced in that manner."

### *Analysis*

Addressing defendant's evidentiary challenge first, the express basis for the court's ruling was that defendant's statements were "self-serving." The court did not expressly address whether the statements qualified as spontaneous statements under section 1240.  Thus, it is not entirely clear if the court excluded the evidence also on hearsay grounds.  It appears exclusion solely on the ground the statements were self-serving would have been improper.  It is true that self-serving extrajudicial declarations by criminal defendants, *not otherwise admissible under an exception to the hearsay rule*, are not admissible for the truth of the matter asserted.  (See *People v. Gurule* (2002) 28 Cal.4th 557, 605–606; *People v. Clay* (1984) 153 Cal.App.3d 433, 457; *People v. Cruz* (1968) 264 Cal.App.2d 350, 361.) However, the fact that a statement is self-serving does not preclude its introduction under an appropriate hearsay exception, such as the spontaneous statement exception.  (See *Lane v. Pacific Greyhound Lines* (1945) 26 Cal.2d 575, 581–582; *Oiye v. Fox* (2012) 211 Cal.App.4th 1036, 1050;; *People v. Cruz, supra*, 264 Cal.App.2d at pp. 359–360, 363; *People v.*

60

*Haskell* (1960) 185 Cal.App.2d 267, 269–273; 10 Witkin, Cal. Evidence (5th ed. 2022) § 10.)

Assuming arguendo the trial court erred in excluding the statements, we conclude any such error was harmless. Had defendant's statements been admitted, there is no reasonable probability the verdict would have been more favorable to him. At the time defendant made the statements, he had a powerful motive to lie. Although the self-serving nature of the statements may not have been a proper basis for its exclusion, as discussed above, it surely would have made the statements less credible to the jury. There was no corroboration for defendant's statements that he had been abandoned on the side of the road. On the other hand, as explained above, there was strong evidence that connected defendant to the charged crimes. (See *ante*, pp. 30–31.) Indeed, defendant's explanation that he had been abandoned on the side of the road falters alone on the evidence of his cell phone activity, which, as noted, placed him in the vicinity of the crime scene minutes after Robinson's car fell off the roadway. Moreover, the jury, in finding defendant guilty beyond a reasonable doubt attempted of premediated murder and the other charges, necessarily rejected the defense's overall theory that someone other than defendant had driven Robinson's car off the roadway. In sum, defendant's abandonment theory was highly implausible, and there is no reasonable probability it would have been credited by the jury even if his self-serving statements had been admitted.

We also reject defendant's claim that the exclusion of his extrajudicial statements violated his federal constitutional right to present a complete defense. His reliance on cases such as *Holmes v. South Carolina* (2006) 547 U.S. 319 (*Holmes*) and *Chambers v. Mississippi* (1973) 410 U.S. 284 (*Chambers*) is misplaced. At issue in *Holmes* was "whether a criminal

defendant's federal constitutional rights are violated by an evidence rule under which the defendant may not introduce proof of third-party guilt if the prosecution has introduced forensic evidence that, if believed, strongly supports a guilty verdict." (*Holmes*, *supra*, 547 U.S. at p. 321.) *Holmes* held that this rule was " 'arbitrary,' " reversed the judgment, and remanded for further proceedings. (*Id.* at p. 331.) Here, defendant does not even attempt to argue the trial court's reliance on California's hearsay restrictions can be equated or even analogized to the South Carolina rule at issue in *Holmes*.

In *Chambers*, the defendant was charged with murder, but another person confessed to friends that he was the killer and later signed a sworn confession. When called as a witness by the defense, however, the person repudiated his confessions. The state court prevented the defense from impeaching its own witness under an antiquated state rule of evidence, and excluded the confessions because Mississippi had no exception to the hearsay rule for statements against penal interest. (*Chambers*, *supra*, 410 U.S. at pp. 291–295, 299.) The United States Supreme Court concluded that the defendant's right to due process had been violated because the evidence was critical, and the combination of two dubious rules of evidence compelled the state court to ignore overwhelming indicia that the hearsay confessions were reliable. (*Id.* at pp. 297–298, 302– 303.) The court emphasized that the confessions were spontaneous and corroborated by other evidence, including eyewitness testimony. (*Id.*, at pp. 294, 300.)

*Chambers*, however, "was an exercise in highly case-specific error correction." (*Montana v. Egelhoff* (1996) 518 U.S. 37, 52.) "[T]he holding of *Chambers*—if one can be discerned from such a fact-intensive case—is certainly not that a defendant is denied 'a fair opportunity to defend against the State's accusations' whenever 'critical evidence' favorable to him is

excluded, but rather that erroneous evidentiary rulings can, in combination, rise to the level of a due process violation." (*Id.* at p. 53; accord, *People v. Ayala* (2000) 23 Cal.4th 225, 269.)

This is not an unusual case like *Chambers*. The trial court here did not apply any "antiquated" evidentiary rule like the "voucher" rule in *Chambers*. Also, defendant had a meaningful opportunity to present a defense, even in the absence of his statements. Rather than a refusal to allow defendant to present a defense, the court here merely rejected certain evidence concerning his defense. Although *Chambers* " 'determined that the combination of state rules resulting in the exclusion of crucial defense evidence constituted a denial of due process under the unusual circumstances of the case before it, it did not question "the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures." (*Chambers . . , supra*, 410 U.S. at pp. 302–303.' " (*People v. Abilez* (2007) 41 Cal.4th 472, 503.) Here, the exclusion of evidence was a garden-variety evidentiary issue and thus did not implicate defendant's federal constitutional right to present a defense. (*Ibid.*) Further, defendant has not shown his statements bore persuasive assurances of trustworthiness similar to the statements in *Chambers*, which were made spontaneously to a friend shortly after the murder occurred, were unquestionably against the declarant's interest, and were corroborated by other evidence in the case. (*Chambers*, at pp. 291–293, 300, 301.) Accordingly, defendant has failed to demonstrate a due process violation.

**Cumulative Prejudice**

Defendant contends a combination of errors rendered his trial fundamentally unfair, requiring reversal. "[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the

63

level of reversible and prejudicial error." (*People v. Hill*, *supra*, 17 Cal.4th at p. 844.) To the extent that there are instances in which we assumed the existence of error, we concluded that no prejudice resulted from any such error. When considered cumulatively, those assumed errors provide no basis for reversal. (See *People v. Potts* (2019) 6 Cal.5th 1012, 1058; *People v. Rogers* (2006) 39 Cal.4th 826, 911.)

### Sentencing Issues

Finally, defendant contends, and the People agree, that his sentence must be vacated and his case remanded for resentencing due to recently enacted legislation that took effect after he was sentenced: Assembly Bill No. 518 (2021–2022 Reg. Sess.) (Assembly Bill 518) and Senate Bill No. 567 (2021–2022 Reg. Sess.) (Senate Bill 567). We accept the People's concessions.

Turning to the more recent legislation, effective January 1, 2022, "Senate Bill 567 amended [Penal Code] section 1170, subdivision (b) to specify that, when a sentencing court chooses a term from a statutory triad, the chosen term shall not exceed the middle term, unless the facts supporting the aggravating circumstances are (1) established by the defendant's stipulation to them, (2) proven to a jury (or to a court, if jury is waived) beyond a reasonable doubt, or (3) based on prior convictions evidenced by a certified record of conviction. (Stats. 2021, ch. 731, §§ 1.3, 3(c), adding Pen. Code, § 1170, subd. (b)(1)–(3), by amendment.)" (*People v. Jones* (2022) 79 Cal.App.5th 37, 44 (*Jones*).)

Assembly Bill 518, another recent enactment that took effect on January 1, 2022, amended Penal Code section 654 to provide in relevant part: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision."

(Stats. 2021, ch. 441, § 1.) " 'Previously, under section 654, "the sentencing court was required to impose the sentence that provides for the longest potential term of imprisonment and stay execution of the other term. [Citation.] . . . [S]ection 654 now provides the trial court with discretion to impose and execute the sentence of either term, which could result in the trial court imposing and executing the shorter sentence rather than the longer sentence." ' " (*Jones*, *supra*, 79 Cal.App.5th at p. 45.)

The parties agree that aspects of defendant's sentence are potentially affected by these amendments. The trial court, applying the pre-Senate Bill No. 567 version of Penal Code section 1170, subdivision (b), imposed the upper term of five years for the domestic violence great bodily injury enhancement (Pen. Code, § 12022.7, subd. (e)) in connection with count one. In selecting the upper term, the court relied on a factor in aggregation—great bodily harm to Robinson—that was not admitted by defendant or found by the jury to be true beyond a reasonable doubt. And, applying the pre-Assembly Bill 518 version of Penal Code section 654, the court imposed and executed the term applicable to the count one attempted murder conviction, while imposing but staying the terms applicable to the assault convictions on counts two and three.

We agree with the parties that defendant is entitled to retroactive application of the ameliorative changes affected by Senate Bill 567 and Assembly Bill 518. (*People v. Flores* (2022) 73 Cal.App.5th 1032, 1039 (*Flores*).) We also agree with the parties that remand is necessary for the court to resentence defendant in accordance with those changes in the law. (See *Flores*, *supra*, 73 Cal.App.5th at p. 1039; *People v. Mani* (2022) 74 Cal.App.5th 343, 381.) Finally, we agree with the People that on remand the sentencing court "is free to conduct a full resentencing." (See *Jones*, *supra*,

65

79 Cal.App.5th at p. 46 ["Although we are not reversing any of [defendant's] convictions or ruling that a portion of his sentence is invalid . . . , we conclude the need to apply amended sections 1170, subdivision (b), and 654 creates sufficiently ' " 'changed circumstances' " ' . . . to warrant a full resentencing"], quoting *People v. Buycks* (2018) 5 Cal.5th 857, 893.)

## DISPOSITION

The judgment of conviction is affirmed. Defendant's sentence is vacated, and the matter is remanded to the trial court so that it may resentence defendant in accordance with Senate Bill 567 and Assembly Bill 518.

_____
Richman, J.

We concur:


_____
Stewart, P.J.


_____
Markman, J. *






*People v. Martin* (A163959)

*Superior Court of Alameda County, Judge Michael Markman, sitting as assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


67